## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MGM RESORTS GLOBAL DEVELOPMENT, LLC; and BLUE TARP REDEVELOPMENT, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; TARA M. SWEENEY, Assistant Secretary, Department of Interior, Indian Affairs; JOHN TAHSUDA, Principal Deputy Assistant Secretary, Department of Interior, Indian Affairs; and DAVID BERNHARDT, Secretary of the Interior<br><br>*Defendants*. | No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, Plaintiffs MGM Resorts Global Development, LLC and Blue Tarp reDevelopment, LLC (collectively, "MGM") bring this action for declaratory and injunctive relief against Defendants the U.S. Department of the Interior; Tara M. Sweeney, in her official capacity as Assistant Secretary, Indian Affairs; John Tahsuda, in his official capacity as Principal Deputy Assistant Secretary, Indian Affairs; and David Bernhardt, in his official capacity as Secretary of the Interior (collectively "Interior").

MGM challenges Interior's unlawful approval of amendments that authorize a proposed commercial casino gaming facility in East Windsor, Connecticut. In particular, MGM challenges Interior's unlawful approval of amendments to (1) the compact between the

1

Mohegan Tribe of Indians of Connecticut and the State of Connecticut, (2) the secretarial procedures prescribed for the Mashantucket Pequot Indian Tribe, (3) the Memorandum of Understanding between the Mashantucket Pequot Indian Tribe and the State of Connecticut, and, to the extent applicable, (4) the Memorandum of Understanding between the Mohegan Tribe of Indians of Connecticut and the State of Connecticut.

These amendments have the stated purpose of facilitating off-reservation, commercial gaming operated by a joint venture wholly owned by Indian tribes. These amendments therefore circumvent IGRA's land-in-trust process, which governs off-reservation gaming, and allow Connecticut's federally-recognized Indian tribes to leverage their duopoly over *tribal* gaming to obtain a monopoly over *commercial* gaming in Connecticut. Interior's approval decisions therefore confer a monopoly on commercial gaming to the joint venture. IGRA was never intended to allow such a scheme, and Interior lacks statutory authority to approve it.

The amendments are not limited to an East Windsor casino: they facilitate commercial, off-reservation gaming by the tribal joint venture *anywhere* in Connecticut, and state legislators have recently proposed granting the joint venture an exclusive, no-bid license to operate a casino in Bridgeport, Connecticut. The amendments thus confer a statewide, perpetual competitive advantage on the joint venture. Once again, IGRA does not contemplate or permit this type of unequal regime governing *commercial* casino development.

Interior's approval decisions are unexplained, unprecedented, and unlawful. Binding precedent dictates that "IGRA affords tools … to regulate gaming on Indian lands, *and nowhere else*." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (emphasis added). But in this case, for the first time in the agency's history, Interior relied on IGRA to approve

amendments that authorize a commercial casino on non-Indian land.  That step exceeded Interior's statutory authority and therefore is unlawful.

Interior's approval decisions also fail the "basic procedural requiremen[t] … that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  The decisions do not explain how the amendments comply with IGRA's "Indian lands" limitation or how Interior could approve the amendments despite having previously "return[ed]" them because the applicants provided "insufficient information upon which to make a decision."  Indeed, Interior's decisions do not even acknowledge the fact that Interior previously returned the amendments.  Moreover, Interior has conceded that it approved one of the amendments "without determining whether the … amendment is actually consistent with the statutory framework of IGRA."

MGM accordingly requests that the Court (1) declare that Interior's approval decisions are in excess of Interior's statutory authority as well as arbitrary and capricious, and (2) vacate the approval decisions.  In support, MGM alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 2201, and 2202, and may hear this action pursuant to the APA, 5 U.S.C. §§ 701–06, because MGM  seeks review of final agency action for which there is no other adequate remedy.

2.      Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because Defendants are principally located in the District of Columbia, and a substantial part, if not all, of the events or omissions giving rise to the claims asserted arose in this District.

## PARTIES

3.      Plaintiff MGM Resorts Global Development, LLC is a Nevada limited liability company with its principal place of business in Nevada.  MGM Resorts Global Development,

LLC is a wholly-owned subsidiary of MGM Resorts International, a Delaware corporation with its principal place of business in Nevada, which owns destination integrated resorts providing hospitality, gaming, and other entertainment offerings.  MGM Resorts Global Development, LLC is the casino-development arm of MGM Resorts International.

4.     Plaintiff Blue Tarp reDevelopment, LLC is a Massachusetts limited liability company with its principal place of business in Massachusetts.  Blue Tarp reDevelopment, LLC operates a gaming establishment known as MGM Springfield in Springfield, Massachusetts and is a wholly-owned subsidiary of MGM Resorts International.

5.     Defendant U.S. Department of the Interior is a federal agency with responsibility for administering and executing IGRA's requirements, including approving or disapproving proposed amendments to gaming compacts and procedures.

6.     Defendant Tara M. Sweeney is Assistant Secretary for Indian Affairs of the U.S. Department of the Interior, with delegated responsibility for administering and executing IGRA's requirements.  Ms. Sweeney is sued in her official capacity as Assistant Secretary.

7.     Defendant John Tahsuda is Principal Deputy Assistant Secretary for Indian Affairs of the U.S. Department of the Interior, with delegated responsibility for administering and executing IGRA's requirements.  Mr. Tahsuda is sued in his official capacity.

8.     Defendant David Bernhardt is the Secretary of the U.S. Department of Interior, with ultimate responsibility for the Interior Department's operations, including administering and executing IGRA's requirements.  Mr. Bernhardt is sued in his official capacity as Secretary.

## STATUTORY AND REGULATORY BACKGROUND

9.     There are two types of casino gaming in the United States: (i) "tribal" gaming operated by Indian tribes on Indian lands pursuant to IGRA, and (ii) "commercial" gaming,

operated by private entities, governed by state law, on non-Indian lands, such as casino gaming conducted in Las Vegas and Atlantic City.

10.     By enacting IGRA in 1988, Congress created a comprehensive framework for regulation of tribal gaming.  Congress enacted IGRA in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that, in the absence of congressional action, tribes could conduct gaming activities on Indian lands with minimal oversight by state regulators.  In passing IGRA, Congress sought "to balance [the] competing policy interests" of federal and state governments, tribes, and "competitive economic interests."  S. Rep. No. 100-446, at 1–2 (1988).  The result was a new federal framework governing gaming operations conducted by Indian tribes on Indian lands.  *See* 25 U.S.C. § 2701, *et seq*.

11.     "[T]he problem Congress set out to address in IGRA (*Cabazon*'s ouster of state authority) arose in Indian lands alone."  As a result, "Everything—literally everything—in IGRA affords tools … to regulate gaming on Indian lands, *and nowhere else*."  *Bay Mills*, 572 U.S. at 795 (emphasis added).

12.     IGRA regulates three classes of tribal gaming, including "Class III" gaming, the type of gaming at issue here.  Class III gaming includes slot machines, table games, and similar Las Vegas-style gaming.  IGRA allows federally-recognized tribes to conduct Class III gaming in narrowly defined circumstances.  *See* 25 U.S.C. § 2710(d).

13.     In particular, IGRA authorizes Class III gaming only "on Indian lands," 25 U.S.C. § 2710(d)(1), which the statute defines as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual[,] or held by any Indian tribe or individual subject to

restriction by the United States against alienation and over which an Indian tribe exercises governmental power," 25 U.S.C. § 2703(4).

14.     A tribe may not conduct Class III gaming on off-reservation lands unless the land is "held in trust by the United States."  25 U.S.C. § 2703(4).  The Indian Reorganization Act and its implementing regulations, however, limit the Secretary's ability to take land into trust for the benefit of Indian tribes or for lands otherwise to become "Indian lands."  *See* 25 U.S.C. § 465; 25 C.F.R. pt. 151.  Among other things, when making a land-in-trust determination, the Secretary considers the distance between the newly acquired land and the tribe's reservation.  *See* 25 C.F.R. § 151.11.

15.     In addition, IGRA authorizes Class III gaming only pursuant to a tribal-state compact or, alternatively, procedures prescribed by the Secretary.  *See* 25 U.S.C. § 2710(d)(1).

16.     A proposed tribal-state gaming compact must be reviewed and approved by the Secretary.  *See* 25 U.S.C. § 2710(d)(8); 25 C.F.R. § 293.15.  The Secretary may disapprove a proposed compact if it violates "any provision" of IGRA, "any other provision of Federal law," or "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); *see also* 25 C.F.R. § 293.14.

17.     Alternatively, in defined circumstances, the Secretary may impose gaming "procedures" authorizing Class III gaming.  *See* 25 U.S.C. § 2710(d)(7); 25 C.F.R. Part 291.  The procedures must be "consistent with the provisions of [IGRA]" and "the relevant provisions of the laws of the State."  25 U.S.C. § 2710(d)(7)(B)(vii).

18.     IGRA imposes further restrictions on gaming on Indian lands acquired after October 17, 1988.  Such gaming is prohibited unless statutory exemptions are satisfied.

19.     Under one such exemption, the Secretary must determine, among other criteria, that tribal gaming "would not be detrimental to the surrounding community."   25 U.S.C. § 2719(b)(1)(A).   In conducting this analysis, Interior considers "[a]nticipated impacts on the economic development, income, and employment of the surrounding community."   25 C.F.R. § 292.18.

20.     Interior regulations allow states and tribes to amend existing gaming authorizations—including compacts, procedures, and related instruments—only with approval of the Secretary.   *See* 25 C.F.R. §§ 291.14, 293.2–293.15.   Amendments are generally subject to the same rules as underlying authorizations: they must be accompanied by adequate documentation, *see* 25 C.F.R. §§ 291.14, 293.8, and must comply with IGRA, other federal laws, and the United States' trust obligations, *see* 25 C.F.R. §§ 291.11(b), 293.14.

21.     An amendment to a tribal-state gaming agreement is not effective unless (i) it is approved by the Secretary (or "deemed approved" by operation of law, which may only occur with respect to compacts, not procedures prescribed by the Secretary), and (ii) Interior publishes a notice of approval in the Federal Register.   *See* 25 C.F.R. § 293.15.   Interior reviews a proposed amendment and the underlying compact or procedures together, as a whole, to determine if the amendment is lawful.   *See* 73 Fed. Reg. 74,004, 74,005 (Dec. 5, 2008).

22.     Although a compact or compact amendment may be "deemed approved" if it is properly submitted and the Secretary fails to approve or disapprove it within 45 days of submission, a compact or compact amendment may be deemed approved "only to the extent" that it "is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C).   This deemed-approval process does not apply to procedures prescribed by the Secretary, or amendments to such procedures.

23.     Interior may return a proposed tribal gaming amendment to the submitting parties if the amendment fails to include the information required by law or is otherwise procedurally defective.  *See, e.g.*, Cheyenne-Arapaho Disapproval Letter at 4–5 (Aug. 1, 2013) (attached as **Exhibit A**).[1]  When Interior returns an amendment, the 45-day review period described above is "not triggered" and the defective amendment cannot be "deemed approved."  *Id.* at 5.

## FACTUAL BACKGROUND

### I.     Tribal Gaming on Indian Lands in Connecticut

24.     There are two federally-recognized Indian tribes in Connecticut: the Mashantucket Pequot Indian Tribe ("Mashantucket Tribe") and the Mohegan Tribe of Indians of Connecticut ("Mohegan Tribe") (collectively, the "Tribes").  *See* 80 Fed. Reg. 1,942, 1,944–45 (Jan. 14, 2015).

25.     The Tribes each operate a casino in Connecticut pursuant to IGRA.   The Mashantucket Tribe operates the Foxwoods casino on its reservation pursuant to procedures issued by the Secretary in 1991, *see* 56 Fed. Reg. 24,996 (May 31, 1991) ("Mashantucket Procedures"), and the Mohegan Tribe operates the Mohegan Sun casino on its reservation pursuant to a compact executed in 1994, *see* 59 Fed. Reg. 65,130 (Dec. 16, 1994) ("Mohegan Compact").  The Tribes have a duopoly on casino gaming in Connecticut; Foxwoods and Mohegan Sun are the only casinos operating in the state.  True and correct copies of these gaming authorizations are attached as **Exhibit B** (Mashantucket Procedures) and **Exhibit C** (Mohegan Compact).

26.     The Mohegan Compact and the Mashantucket Procedures permit the Tribes to offer table games at their on-reservation casinos, but prohibit the Tribes from operating slot machines "unless and until" (i) such gaming is authorized by a new tribal-state agreement or court

---

[1]     *Available   at*   https://www.bia.gov/sites/bia_prod.opengov.ibmcloud.com/files/assets/as-ia/oig/pdf/idc1-028608.pdf

order, or (ii) Connecticut law is amended to allow slot-machine gaming "by any person, organization, or entity." *See* Mohegan Compact § 15(a); Mashantucket Procedures § 15(a). These provisions are known as the "slots moratoria."

27.     In 1994, the Tribes executed separate Memoranda of Understanding ("MOUs") with Connecticut that lifted the slots moratoria at Foxwoods and Mohegan Sun, allowing each Tribe to operate slot machines in exchange for a 25 percent royalty to Connecticut on the slot-machine revenues. *See* Mohegan MOU ¶ 5; Mashantucket MOU ¶¶ 2, 4 (the Mohegan Compact and Mashantucket Procedures, and their respective MOUs, are referred to collectively as the "Gaming Authorizations"). True and correct copies of these MOUs are attached as **Exhibit D** (Mashantucket MOU) and **Exhibit E** (Mohegan MOU).

28.     Connecticut uses the royalty payments mandated by the MOUs, which exceeded $250 million in the 2018–19 fiscal year, to fund statewide programs.

29.     The MOUs contain "exclusivity" clauses providing that if any other entity is authorized to conduct casino gaming in Connecticut, the Tribes are no longer required to pay Connecticut a 25 percent royalty on their slots revenues at Foxwoods and Mohegan Sun. *See* Mohegan MOU ¶ 1; Mashantucket MOU ¶ 1.

## II.     MGM's Springfield Casino

30.     MGM Resorts International, MGM's parent company, has a portfolio that encompasses 30 unique hotel and destination gaming offerings including some of the most recognizable resort brands in the industry.

31.     As the casino-development arm of MGM Resorts International, MGM regularly pursues development opportunities throughout the United States. In that role, MGM stays apprised

of proposals to expand commercial casino gaming and competes with other operators (including the Tribes) for licenses when new jurisdictions open their doors to casino gaming.

32.     In recent years, MGM has evaluated potential expansion opportunities arising out of proposed legislation in several states, including Georgia, Maryland, Massachusetts, and New Jersey.

33.     In 2014, MGM obtained a license to develop MGM Springfield in Massachusetts. The Mohegan Tribe competed with MGM for that license in an open, transparent, and competitive selection process.

34.     MGM began construction of MGM Springfield in 2015 and opened MGM Springfield for business in 2018.

35.     MGM Springfield is located 12 miles north of the site of the proposed commercial gaming facility in East Windsor, Connecticut.

36.     MGM Springfield competes in Connecticut for customers, revenue, advertising, and employees, including by placing advertisements and running promotions in Connecticut as part of its marketing efforts.  For example, MGM Springfield has spent more than $1 million on media in Connecticut since opening in 2018.

### III.    Connecticut Adopts Legislation Authorizing a Proposed Commercial Casino in East Windsor, in Response to MGM Springfield

37.     In response to the licensing of MGM Springfield in 2014, Connecticut moved forward with legislation to authorize competing commercial casinos in Connecticut.

38.     In May 2015, Connecticut enacted Special Act 15-7, which authorized creation of a "tribal business entity … owned exclusively by the" Tribes and vested that entity with the exclusive right to execute a development contract for Connecticut's first commercial casino.

Special Act 15-7 § 1(a)-(f).[2]  Special Act 15-7 thus permitted the tribal business entity to plan and make contracts for a commercial casino, while requiring additional legislation to operate the new casino.

39.      In August 2015, the Tribes registered the tribal business entity authorized by Special Act 15-7, naming it MMCT Venture, LLC ("MMCT").  MMCT is a limited liability company formed under and governed by Connecticut state law.  A true and correct copy of MMCT's Articles of Organization is attached as **Exhibit F**.

40.      After its formation, MMCT moved forward with efforts to develop a Connecticut casino.  In February 2017, MMCT executed a development contract with the Town of East Windsor, Connecticut for construction and operation of a new commercial casino in a retail plaza located approximately 45 miles from the Tribes' reservations and 12 miles south of MGM Springfield.

41.      The proposed East Windsor casino would be operated on private property and would not be on "Indian lands" under IGRA.  As a result, operation of the proposed East Windsor casino would not be governed by IGRA, but would instead be governed by state law.

42.      In June 2017, Connecticut enacted Public Act 17-89, which conditionally authorizes MMCT to operate its proposed East Windsor casino.  Prior to the enactment of Public Act 17-89, Connecticut law prohibited casino gaming except at the Tribes' on-reservation casinos.

43.      The Connecticut legislature designed Special Act 15-7 and Public Act 17-89 to counteract the effect of increasing regional competition on Connecticut's casino revenues—in particular, competition from MGM Springfield.  Senator Martin Looney, one of Public Act 17-89's sponsors, stated that Connecticut's gaming market was "threatened by competition from …

---

[2] *Available at* https://www.cga.ct.gov/2015/ACT/sa/pdf/2015SA-00007-R00SB-01090-SA.pdf

the very large MGM casino soon to open in Springfield." *See* Conn. General Assembly, Senate Debate on Public Act 17-89 (May 23, 2017) ("May 2017 Debate").[3]  Representative Chris Davis, another sponsor, similarly noted that MMCT's proposed East Windsor casino would "compet[e] for a share of gamblers who otherwise would go to [MGM] Springfield." *See* Mark Pazniokas, *Hartford's 11th-hour casino game is 'Let's Make a Deal'*, The Connecticut Mirror (June 5, 2017).[4] Other legislators explained that Public Act 17-89 was "precipitated by the development of the MGM property in Springfield," May 2017 Debate, *supra* (statement of Sen. Len Suzio), and expressed "concer[n]" that "MGM [would] somehow fin[d] a way to open a casino elsewhere in Connecticut," May 2017 Debate, *supra* (statement of Sen. Michael McLachlan).  Connecticut Lieutenant Governor Nancy Wyman likewise told supporters that there are "three letters we don't want to talk about … Let them stay out of our state"—remarks news reports interpreted to be "[c]learly … referring to M-G-M."  Brian Hallenbeck, *Mohegan Chairman Says BIA's Letters Constitute Approval of Third Casino*, The Day (Sept. 25, 2017).[5]

44.    Public Act 17-89 provides that "MMCT Venture, LLC, is authorized to conduct [casino] gaming … at 171 Bridge Street, East Windsor," but provides that "[s]uch authorization shall not be effective unless": (1) the Tribes and the Governor execute "amendments to" the Gaming Authorizations creating a special exemption for MMCT, such that "authorization of MMCT … to conduct [casino] games in the state does not terminate" the Tribes' duty to pay Connecticut a 25 percent royalty on slots revenues from Foxwoods and Mohegan Sun; (2) the

---

[3] *Available at* https://www.cga.ct.gov/2017/trn/S/2017STR00523-R00-TRN.htm

[4] *Available at* https://ctmirror.org/2017/06/05/hartfords-11th-hour-casino-game-is-lets-make-a-deal/

[5] *Available at* http://www.theday.com/article/20170925/BIZ02/170929611

amendments "are approved by" the Connecticut legislature; and (3) the amendments "are approved or deemed approved by the Secretary of the United States Department of the Interior pursuant to the federal Indian Gaming Regulatory Act … and its implementing regulations."  Public Act 17-89, § 14(c)(1)-(2).[6]

45.     The amendments required by Public Act 17-89 are necessary to ensure that Connecticut continues receiving royalty payments from Foxwoods and Mohegan Sun even after MMCT is authorized to operate its proposed East Windsor casino.  Connecticut's Attorney General has advised that MMCT is a "person, organization, or entity" under the slots moratoria and an "other person" under the MOUs.  *See* Letter from George C. Jepsen, Conn. Attorney General, to Conn. General Assembly, at 3 (Apr. 15, 2015).[7]  Thus, without amendments exempting MMCT from those definitions, legislation authorizing MMCT to operate a Connecticut casino would violate the Gaming Authorizations' exclusivity clauses and slots moratoria, and would terminate Connecticut's right to receive royalty payments from Foxwoods and Mohegan Sun.

46.     Accordingly, the amendments ensure that MMCT's commercial casino (or any other commercial casino owned and operated by an entity owned by both Tribes) does not run afoul of these exclusivity provisions and thus terminate the Tribes' obligations to make revenue-sharing payments to the State under their respective MOUs.  In short, the purpose and function of the amendments is to facilitate off-reservation, commercial gaming by MMCT, a private limited liability company.

---

[6] *Available at* https://www.cga.ct.gov/2017/act/pa/pdf/2017PA-00089-R00SB-00957-PA.pdf

[7] *Available at* https://www.cga.ct.gov/ps/related/20170223_Informational%20Forum%20On%20 Gaming/Informational%20Forum%20On%20Gaming%20MGM%20Background%20 Information.pdf (reprinted at pages 5-10).

47.     The Tribes and Connecticut Governor Dannel P. Malloy executed amendments to the Mohegan Compact, the Mohegan MOU, the Mashantucket Procedures, and the Mashantucket MOU in July 2017 (collectively, the "Amendments").  True and correct copies of the amendments to the Mohegan Compact and Mohegan MOU are attached as **Exhibit G**.  True and correct copies of the amendments to the Mashantucket Procedures and Mashantucket MOU are attached as **Exhibit H**.

48.     The Connecticut legislature approved the Amendments on July 31, 2017 and indicated in its approval resolution that the Amendments "will authorize" MMCT to "operate a gaming facility in East Windsor, Connecticut."  Conn. H. J. Res. No. 301 (July 31, 2017).

49.     The Amendments are unprecedented.  No other tribe has ever used IGRA's amendment procedure to authorize the operation of a commercial, off-reservation casino.  No state has ever implemented a hybrid commercial-tribal gaming scheme similar to Connecticut's.  And, before the approval decisions at issue here, Interior had never approved amendments to facilitate such a scheme.

## IV.     Interior Returns the Amendments

50.     After the Governor executed the Amendments and the Connecticut legislature approved them, approval by Interior represented the sole remaining requirement to allow MMCT to operate the proposed East Windsor casino.  *See* Public Act 17-89, § 14(c)(1)-(5).

51.     The Tribes and Connecticut submitted the Amendments to Interior on or about August 2, 2017.

52.     Interior reviewed the Amendments to determine whether or not they were properly submitted and whether or not the Amendments comply with IGRA and other federal laws.

53.     MGM participated in Interior's review process, through its employees and outside consultants, by meeting with Interior officials and submitting comments explaining, among other things, that the Amendments violate IGRA and therefore must be disapproved.

54.     On September 15, 2017, Interior issued orders "return[ing] the Amendment[s]" to the Tribes and Connecticut without approving or disapproving them, explaining that the Amendments provided "insufficient information upon which to make a decision."   True and correct copies of these orders are attached as **Exhibit I**.

55.     Despite Interior's September 15, 2017 orders, the Tribes asserted that Interior had a duty to issue a deemed-approval notice with respect to the Amendments.

56.     MGM submitted 24 pages of additional comments, through its outside consultants, to Interior on October 30, 2017.  A true and correct copy of these comments is attached as **Exhibit J**.  Among other points, MGM's comments argued that Interior's September 15, 2017 orders precluded the Amendments from being deemed approved, and that the Amendments could not be approved or deemed approved because they contravene IGRA's text, structure, and purposes. Interior requested additional copies of these comments on October 30, 2017, which MGM's outside consultants delivered and Interior received on October 31, 2017.

57.     On August 15, 2018, Interior responded to a July 5, 2018 Freedom of Information Act ("FOIA") request filed by MGM requesting materials relating to Interior's consideration of the Amendments.  Interior included a copy of MGM's October 30, 2017 comments in this FOIA response.

58.     In response to Interior's September 15, 2017 orders, the Tribes and Connecticut jointly filed suit against Interior on November 29, 2017, seeking a declaration that the Amendments "are deemed approved" and a writ of mandamus "directing [Interior] to publish a

notice of approval [of the Amendments] in the Federal Register." *Connecticut v. Dep't of the Interior*, No. 17-cv-02564, ECF 1 (D.D.C. Nov. 29, 2017).

59.     On December 26, 2017, MGM moved to intervene in the *Connecticut* litigation based on, among other things, its interests "as a developer of a proposed casino in Bridgeport and as an operator of MGM Springfield." *Connecticut v. Dep't of the Interior*, No. 17-cv-02564, ECF 11 (D.D.C. Dec. 26, 2017).

60.     The Court granted MGM's motion to intervene.  *See Connecticut v. Dep't of the Interior*, 344 F. Supp. 3d 279, 305 (D.D.C. 2018).

61.     Ultimately, the Plaintiffs and the Federal Defendants filed stipulations to dismiss the *Connecticut* lawsuit, in light of Interior's subsequent approval and deemed approval of the Amendments, as described below.  *See Connecticut*, 344 F. Supp. 3d at 307; *Connecticut v. Dep't of the Interior*, No. 17-cv-02564, ECF 40 (D.D.C. June 15, 2018).

**V.      Interior Reverses Course and Approves the Amendments**

62.     After returning the Amendments, and without receiving the additional information needed to make a decision, Interior reversed course and approved the Mohegan Compact amendment, the Mashantucket Procedures amendment, and the Mashantucket MOU amendment. Interior's approval decisions are unexplained, unprecedented, and unlawful.

63.     On June 1, 2018, Interior published a notice in the Federal Register indicating that the proposed amendment to the Mohegan Compact had been deemed approved.  The notice states that the Secretary "took no action" on the amendment and that the amendment "is considered to have been approved, but only to the extent that the Amendment is consistent with IGRA."  83 Fed. Reg. 25,484, 25,484 (June 1, 2018).  A true and correct copy of this notice is attached as **Exhibit K**.

64.     The June 1, 2018 Federal Register notice does not indicate whether the amendment to the Mohegan MOU was deemed approved.  However, MMCT has asserted that all requirements for operation of the East Windsor casino have been satisfied, and Interior's March 15, 2019 letter approving the Mashantucket Procedures amendment (discussed below) implies that the Mohegan MOU amendment was deemed approved.  To the extent the Mohegan MOU amendment was in fact deemed approved, MGM challenges that approval as well.

65.     Interior did not explain why it allowed the amendment to the Mohegan Compact to be deemed approved, why it changed its position after returning the amendment on September 15, 2017, or how the amendment could be deemed approved after having been returned based on "insufficient information."

66.     In fact, an Interior spokesperson stated on May 31, 2018, the day before the Federal Register notice was published, that Interior permitted the Mohegan Compact amendment to be deemed approved "without determining whether the Mohegan compact amendment is actually consistent with the statutory framework of IGRA."  Andrew Westney, *BIA Says Mohegan-Conn. Gambling Deal Change Is In Effect*, Law360 (May 31, 2018).[8]  A true and correct copy of this article is attached as **Exhibit L**.

67.     On March 25, 2019, Interior published a notice in the Federal Register indicating that Interior had approved the amendments to the Mashantucket Procedures and Mashantucket MOU.  *See* 84 Fed. Reg. 11,122 (Mar. 25, 2019).  The notice states that the amendment to the Mashantucket Procedures was approved on March 15, 2019, and that the amendment to the Mashantucket MOU was approved on March 19, 2019.  A true and correct copy of this notice is attached as **Exhibit M**.

---

[8] *Available at* https://www.law360.com/articles/1048901/

68.     Interior again did not explain why it approved the amendments to the Mashantucket Procedures and Mashantucket MOU, why it changed its position after returning the amendments on September 15, 2017, or how the amendments could be approved after having been returned based on "insufficient information."

69.     MGM submitted a FOIA request to Interior on March 25, 2019—the same day the approval of the Mashantucket amendments was published in the Federal Register—seeking all documents explaining or relating to Interior's approval of the Mashantucket amendments or the "deemed approval" of the Mohegan Compact amendment.

70.     In response to MGM's March 25, 2019 FOIA request, Interior provided, among other items, two documents: (1) a three-page March 19, 2019 letter from Interior approving the Mashantucket MOU amendment, attached as **Exhibit N**, and (2) a two-page March 15, 2019 letter approving the Mashantucket Procedures amendment, attached as **Exhibit O**.

71.     The two-page March 15 letter, signed by Defendant Sweeney, contains the operative reasoning for Interior's approval of the Mashantucket amendments.  The letter states:

> After reviewing the Procedures Amendments, I have determined that the Tribe's request to amend its Class III gaming procedures does not violate IGRA.  Similar to the Mohegan Amendments, the [Mashantucket] Procedures Amendments are narrowly tailored to affirm only that the Tribe's exclusive rights to operate certain forms of IGRA-sanctioned Class III gaming under its procedures, issued by the Department in 1991, will remain unaffected if the Tribe and Mohegan are authorized by the State under its laws to operate a gaming facility located out of the Tribe's or the Mohegan's Indian lands, as defined by IGRA.  I have therefore approved the enclosed amendments to the Tribe's Class III gaming procedures.

72.     Interior's March 15 letter also states that "[i]n such circumstances that we believe are unique only to the State of Connecticut, the Mohegan Amendments are therefore consistent with, and in fact do not violate, IGRA."

73.     Interior's March 15 letter is devoid of any other reasoning or justification in support of its approval of the Mashantucket amendments.

74.     Interior has not provided any other documents explaining, justifying or underlying Interior's approval decisions.

75.     Interior's March 15 and March 19 letters do not acknowledge that MGM submitted comments concerning the Amendments or respond to the arguments raised in those comments.

76.     Interior's March 15 and March 19 letters do not acknowledge that Interior "returned" the Mashantucket amendments due to insufficient information on September 15, 2017, or explain how Interior could approve amendments that had been returned to the applicants 18 months earlier and which had not been resubmitted.

## VI.    Competitive Bidding Alternative and MGM's Proposed Bridgeport Casino

77.     In 2015, in light of Connecticut's potential commercial gaming expansion, MGM studied the Connecticut gaming market and determined that a Connecticut-based casino would be commercially desirable.  MGM thus began taking steps to secure authorization to develop and operate such a casino, including by performing a feasibility study of a casino gaming facility in southwestern Connecticut and applying to register a casino-development entity under Special Act 15-7.  The Connecticut Secretary of the State denied MGM's application on July 23, 2015 because the entity authorized by Special Act 15-7 must be "owned exclusively by" the Tribes and MGM "ha[s] no affiliation with either of th[e] tribes."

78.     MGM has the casino-development expertise and the financial resources to develop and operate a commercial casino in Connecticut.

79.     MGM began advocating in 2015 for adoption of a competitive selection process for the right to operate Connecticut's first commercial casino—i.e., a casino operated on private land

under state law, rather than pursuant to IGRA on Indian lands—and has continuously advocated for such legislation since that time, including in hearings before the Connecticut legislature and meetings with the Governor and other state leaders. MGM has spent more than $3.2 million in support of these legislative efforts.

80.     In 2017, the Connecticut legislature considered a competitive-bid bill supported by MGM alongside legislation that would grant a casino license exclusively to MMCT, and that was eventually enacted as Public Act 17-89.

81.     In May 2018, the Connecticut House of Representatives passed legislation authorizing a competitive selection process for bids to operate Connecticut's first commercial casino. The legislation would direct the State to issue a request for proposals for a new casino and would allow any interested party, including MGM, to participate. MGM supported this legislation and continues to advocate for its enactment.

82.     MGM has pursued every available opportunity to compete in the Connecticut casino market since 2015. For example, in September 2017, MGM unveiled a proposal for a $675 million resort casino in Bridgeport. The proposal satisfies the requirements of the 2018 competitive-bid bill and includes a waterfront casino site, renderings of the casino's design, and a comprehensive list of gaming features and other amenities that would be offered at the new venue. MGM has secured contractual rights to a proposed development site, a prime real estate parcel located near downtown Bridgeport. *See* MGM Bridgeport, About the Project[9]; Kenneth R. Gosselin, *MGM Announces Plan for Waterfront Casino in Bridgeport*, Hartford Courant (Sept. 18,

---

[9]     *Available at* https://www.mgmresorts.com/en/hotels/united-states/bridgeport/about-the-project.html

2017).[10]   Other sites in Connecticut are also viable locations for a commercial casino gaming facility.

83.     On December 6, 2017, the Tribes announced their own proposal for a competing Bridgeport casino.  The Tribes and MMCT have continued to express a desire to pursue casino gaming opportunities in the Bridgeport area since that time.  The Tribes and MMCT recently met with Bridgeport's mayor and other state lawmakers regarding a possible Bridgeport casino.  *See* Frankie Graziano, *Tribes Representing Foxwoods, Mohegan Sun Talking With Bridgeport About Casino Deal*, WNPR (June 3, 2019)[11]; Emilie Munson, *Tribes, Bridgeport near casino deal that could replace MGM plan*, The Middletown Press (May 31, 2019).[12]   In July 2019, lawmakers proposed a bill that would "authorize[] [MMCT] to operate a casino gaming facility in the city of Bridgeport."  A true and correct copy of the proposed MMCT Bridgeport bill is attached as **Exhibit P**.

84.     MGM has been, and remains, ready, willing, and able to submit a bid for a commercial casino license under the 2018 competitive-bid bill (or equivalent legislation) and, if selected as the winning bidder, begin developing a casino in Connecticut, including in Bridgeport.

85.     MGM owns property on Prospect Hill Drive in East Windsor, Connecticut, approximately one mile from the site of the East Windsor casino, and one half mile from Prospect Hill Road, which would serve as one of two main entry points for that casino.  MGM has conducted

---

[10]     *Available    at*    http://www.courant.com/business/hc-bridgeport-casino-mgm-steelpointe-20170918-story.html

[11] *Available at*  https://www.wnpr.org/post/tribes-representing-foxwoods-mohegan-sun-talking-bridgeport-about-casino-deal.

[12] *Available at* https://www.middletownpress.com/middletown/article/Tribes-Bridgeport-near-casino-deal-that-could-13908480.php

meetings and other business at its East Windsor property, and plans to continue using the property for those and other purposes.

## INJURIES RESULTING FROM INTERIOR'S REVERSAL

86.     Interior's approval of the Amendments inflicts at least two legally cognizable injuries on MGM, as this Court has already ruled.  *See Connecticut*, 344 F. Supp. 3d at 305 (D.D.C. 2018).

87.     First, because of Interior's approvals, MGM will be placed at a competitive disadvantage vis-à-vis MMCT in bidding to operate a commercial casino in Connecticut.  *See Connecticut*, 344 F. Supp. 3d at 297.  The Amendments grant MMCT a competitive advantage by authorizing the proposed East Windsor casino, which MMCT has the sole right to develop.  The Amendments also give MMCT an advantage in any competitive bidding process Connecticut might establish, whether for East Windsor or anywhere else in the state:  The Amendments "are worded such that MMCT could build casinos elsewhere in the state without causing the state to forfeit the royalty payments it receives from the tribal casinos' gaming operations."  *Id.* at 298.  If MGM were to operate a Connecticut casino, however, these payments would be forfeited pursuant to the MOUs' exclusivity clauses, thus costing the state hundreds of millions in annual revenue.  That dynamic, which is caused by the Amendments, puts MGM at a competitive disadvantage in bidding on a casino in Bridgeport or elsewhere in Connecticut.  "Such an alteration in competitive conditions 'clearly amounts to a concrete injury.'"  *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 12 (D.D.C. 2016) (cleaned up).

88.     Indeed, in July 2019, lawmakers proposed legislation that would "vastly expand the gambling monopoly of the [Tribes] by" granting MMCT an exclusive, no-bid license "to build a $100 million casino in Bridgeport."  *See* Emilie Munson, *Bridgeport casino, internet gaming*

*proposed in new bill*, The Wilton Bulletin (July 31, 2019)[13]; *see also* Proposed MMCT Bridgeport Bill (Ex. P).  The proposed legislation would authorize a Bridgeport casino without conducting a competitive bidding process, without further amendment to the Gaming Authorizations, and without that casino relieving the Tribes of their obligation to pay a 25 percent royalty on their slots revenues at Foxwoods and Mohegan Sun.

89.     Second, by authorizing the proposed East Windsor casino, located 12 miles south of MGM Springfield, the Amendments will expose MGM Springfield to increased competition. *See Connecticut*, 344 F. Supp. 3d at 298.

90.     Accordingly, "MGM has competitor standing" because, as a result of Interior's approval decisions, "MGM's Springfield casino will face an 'imminent increase in competition' from" MMCT's East Windsor casino, located "less than twenty miles away." *Connecticut*, 344 F. Supp. 3d at 299.  As this Court has explained and as the legislative history demonstrates, Connecticut sought Interior's approval to amend the Gaming Authorizations because the MMCT casino "would compete with MGM Springfield." *Id.*

91.     Public Act 17-89 provides conditional authorization for MMCT to operate the proposed East Windsor casino.  MMCT has asserted that all of Public Act 17-89's conditions have been satisfied, and that Interior's approval, without further legislative or regulatory action, activates MMCT's right to operate a new commercial casino in East Windsor, subjecting MGM Springfield to additional competition just 12 miles away.

92.     MMCT recently announced that it is proceeding with its East Windsor casino.  In late April 2019, press reports indicated that MMCT expects to announce a "construction timeline

---

[13] *Available at* https://www.wiltonbulletin.com/news/article/Bridgeport-casino-internet-gaming-proposed-in-14269836.php

soon." New Haven Register, *Tribes Submit $1 Million Payment for Casino Regulatory Costs* (Apr. 26, 2019).[14]

93.     If legislation is enacted authorizing MMCT to operate a casino in Bridgeport, that casino would subject MGM's Empire City Casino in Yonkers, New York, located less than 50 miles from Bridgeport, to additional competition.

94.     Interior's approval decisions also injure MGM in its capacity as a "neighbor of [MMCT's] planned gaming facility" in East Windsor. *Amador Cnty. v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011).

## CLAIMS FOR RELIEF

### COUNT I:  Violation of IGRA by Approving Amendments That Facilitate Commercial Gaming on Non-Indian Lands

95.     Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 94 as if fully set forth herein.

96.     Congress designed IGRA "to facilitate on-reservation gaming." *Connecticut*, 344 F. Supp. 3d at 302.  "Everything—literally everything—in IGRA affords tools . . . to regulate gaming on Indian lands, *and nowhere else*." *Bay Mills*, 572 U.S. at 795 (emphasis added). "[G]aming on non-Indian lands is not authorized by or regulated under IGRA." *N. Cnty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 744 (9th Cir. 2009).

97.     Interior violated IGRA by approving the Amendments, whose sole purpose is to facilitate commercial gaming on non-Indian lands.  The East Windsor casino authorized by the Amendments is located on private land 45 miles from the Tribes' reservations and would be owned and operated by MMCT, a private limited liability company.  The Amendments do not enhance or

---

[14] *Available at* https://www.nhregister.com/news/article/Tribes-submit-1-million-payment-for-casino-13799347.php

support on-reservation tribal gaming, and in fact have the effect of *diminishing* such gaming, because some customers will travel to MMCT's commercial facility in East Windsor instead of visiting the on-reservation casinos at Mohegan Sun and Foxwoods.

98.     Interior's approvals also unlawfully permit an end-run around and eviscerate IGRA's land-in-trust provisions.  *See* 25 U.S.C. § 2719.  Land taken into trust after 1988 may be used for tribal gaming only if, among other preconditions, the Secretary "determines that a gaming establishment on newly acquired lands … would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A).  In approving the Amendments without making such a determination, and without making any of the other determinations necessary to take land into trust under 25 C.F.R. Part 151, Interior allowed MMCT to circumvent IGRA's land-in-trust requirements by facilitating casino gaming on non-Indian lands by a commercial entity wholly owned by the Tribes.

99.     For the first time in the agency's history, Interior approved amendments that authorize a commercial casino, owned and operated by a tribal joint venture, on non-tribal land.

100.     Interior's March 15, 2019 and March 19, 2019 letters do not address these legal issues and likewise do not provide a reasoned explanation why the Amendments comply with IGRA.

101.     Interior's approval decisions exceeded the agency's statutory authority, are arbitrary, capricious, and contrary to law, and should be set aside as unlawful.  *See* 5 U.S.C. § 706(2).

### COUNT II:  Violation of IGRA and the APA by Approving Amendments That Had Been Returned and So Were No Longer Before Interior

102.     Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 101 as if fully set forth herein.

25

103.    IGRA requires that compacts and compact amendments be "submitted to the Secretary for approval."  25 U.S.C. § 2710(d)(8)(C); *see also* 25 C.F.R. § 291.11 (describing steps that the Secretary must take "upon receiving" gaming procedures proposal).  After an amendment is submitted, the Secretary is authorized to approve or disapprove the amendment. 25 U.S.C. § 2710(d)(8)(A)-(D); *see also* 25 C.F.R. Part 291.

104.    If an amendment does not include the information required by IGRA and its implementing regulations, Interior returns the amendment to the submitting parties.  *See, e.g.*, Cheyenne-Arapaho Disapproval Letter at 4–5 (Aug. 1, 2013) (Ex. A).

105.    The Amendments were submitted to Interior and received on August 2, 2017.

106.    The Amendments did not include all the information required by IGRA and its implementing regulations and therefore were not properly submitted.

107.    Interior "return[ed]" the Amendments to Connecticut and the Tribes on September 15, 2017 because the Amendments included "insufficient information upon which to make a decision."

108.    Following Interior's September 15, 2017 decision, none of the Amendments were pending before Interior and the Secretary did not have before him any amendments to approve (or allow to be deemed approved).

109.    On information and belief, the Amendments were not re-submitted to Interior after September 15, 2017, and the required information missing from the Amendments was not provided to Interior after that date.

110.    Interior nonetheless published Federal Register notices purporting to allow the amendment to the Mohegan Compact to be deemed approved on June 1, 2018 and to approve the

amendments to the Mashantucket Procedures and Mashantucket MOU on March 25, 2019.  *See* 83 Fed. Reg. at 25,484; 84 Fed. Reg. at 11,122.

111.    Neither the Federal Register notices nor Interior's March 15, 2019 and March 19, 2019 letters explain how Interior could approve amendments it had previously returned.  Indeed, the letters do not even acknowledge that the Amendments were previously returned.

112.    Interior violated IGRA and the APA, 5 U.S.C. § 706(2), by approving the Amendments, which were no longer pending before the Secretary at the time of approval.

**COUNT III: Violation of the APA by Issuing a Deemed Approval Notice with Respect to Mohegan Compact Amendment**

113.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 112 as if fully set forth herein.

114.    Even if Interior had not returned the Mohegan amendments, those amendments could not lawfully have been deemed approved.

115.    IGRA's 45-day review period does not begin to run if an amendment is not properly submitted to Interior, and in that instance the amendment is not deemed approved merely because 45 days pass after its submission.  *See, e.g.*, Cheyenne-Arapaho Disapproval Letter at 4–5 (Aug. 1, 2013) (Ex. A).

116.    The Amendments were not properly submitted to Interior because they failed to include information required by IGRA and its implementing regulations.  For example, the Amendments failed to include a "[c]ertification from" Governor Malloy "that he … [wa]s authorized under State law to enter into the … amendment[s]."  25 C.F.R. § 293.8(c).

117.    Interior determined on September 15, 2017 that the Amendments included "insufficient information upon which to make a decision."

118.    Because the Amendments included insufficient information, they could not be deemed approved.  *See, e.g.*, Cheyenne-Arapaho Disapproval Letter at 4–5 (Aug. 1, 2013) (Ex. A).

119.    On information and belief, the Mohegan Compact amendment and the Mohegan MOU amendment were not re-submitted to Interior after September 15, 2017, and the required information missing from the Amendments was not provided to Interior after that date.

120.    On June 1, 2018, Interior published a notice of deemed approval with respect to the Mohegan Compact amendment.  83 Fed. Reg. at 25,484.  On March 15, 2019, Interior asserted in a separate document that the Mohegan MOU amendment was deemed approved by virtue of the same Federal Register notice.  *See* March 15, 2019 Letter at 1, n.2 (Ex. O).

121.    Interior's deemed approval of the Mohegan Compact amendment and, if applicable, the Mohegan MOU amendment, despite not having received the information required by IGRA and its implementing regulations, was arbitrary, capricious, and contrary to law.  *See* 5 U.S.C. § 706(2); Cheyenne-Arapaho Disapproval Letter at 4–5 (Aug. 1, 2013) (Ex. A).

**COUNT IV:  Violation of the APA by Failing to Explain Approvals and Changes in Position**

122.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 121 as if fully set forth herein.

123.    Interior's decisions approving the Amendments are arbitrary, capricious, and contrary to law, in violation of the APA.

124.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

28

125.     An agency must base its actions "on a consideration of the relevant factors" and "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).  The APA thus imposes a "basic procedural requirement[t] … that an agency must give adequate reasons for its decisions." *Encino Motorcars*, 136 S. Ct. at 2125.

126.     When an agency changes its position, it must recognize that fact and provide a rational explanation for the new position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).  If an agency departs from its prior position without acknowledging the departure, or without providing a reasoned explanation for the change in course, its action is arbitrary and capricious in violation of the APA. *Id.* at 515.

127.     Interior has not acknowledged its departure from the September 15, 2017 orders, or adequately explained its decisions to (1) approve the amendments to the Mashantucket Procedures and Mashantucket MOU or (2) allow the Mohegan Compact amendment (and, if applicable, the Mohegan MOU amendment) to be deemed approved. *See* 83 Fed. Reg. at 25,484; 84 Fed. Reg. at 11,122.  Indeed, Interior's Bureau of Indian Affairs issued a statement conceding that Interior issued the Mohegan Compact amendment deemed-approval notice "without determining whether the Mohegan compact amendment is actually consistent with the statutory framework of IGRA." Andrew Westney, *BIA Says Mohegan-Conn. Gambling Deal Change Is In Effect*, Law360 (May 31, 2018) (Ex. L).

128.     The only explanation provided for Interior's approval of the amendments to the Mashantucket Procedures and the Mashantucket MOU was that those amendments "are narrowly tailored to affirm only that the Tribe's exclusive rights to operate certain forms of IGRA-

sanctioned Class III gaming under its procedures, issued by the Department in 1991, will remain unaffected if the [Mashantucket] Tribe and Mohegan are authorized by the State under its laws to operate a gaming facility located out of the Tribe's or the Mohegan's Indian lands, as defined by IGRA." March 15, 2019 Letter, at 1 (Ex. O).

129.    That explanation is arbitrary, capricious, and contrary to law.

130.    The Amendments have the sole purpose and effect of authorizing commercial gaming on non-Indian lands, an issue Interior's approval decisions do not address.  As a result, Interior "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

131.    Interior's approval decisions do not mention, much less respond to, the arguments presented by MGM, including in MGM's October 30, 2017 comments, regarding why the Amendments may not be approved or deemed approved.

132.    Interior's approval decisions do not explain how approving the Amendments, which would diminish on-reservation gaming in favor of MMCT's off-reservation, commercial facility, is consistent with IGRA or Interior's trust obligations.

133.    Interior's March 15, 2019 letter incorrectly states that the Amendments address a situation where "the [Mashantucket] Tribe and Mohegan [Tribe] are authorized by the State under its laws to operate a gaming facility."  In fact, the Amendments address a situation where a "business entity owned exclusively" by the Tribes (i.e., MMCT—a private limited liability company formed under state law) is authorized to operate a gaming facility in the state.

134.    Interior's approval decisions do not evaluate the propriety of using IGRA's amendment mechanism to facilitate a state statute providing a monopoly on commercial gaming to a specific commercial entity.

135.    Interior's March 15, 2019 letter fails to identify the "unique" circumstances in Connecticut that cause the Amendments to comply with IGRA, and likewise fails to respond to MGM's October 30, 2017 comments describing the serious practical problems that approval would cause in other states.

136.    The explanations Interior has provided are particularly inadequate in light of Interior's changed position and the novel and unprecedented nature of the Amendments.

137.    On September 15, 2017, Interior issued a ruling on the Amendments, explaining that it was "return[ing] the Amendment[s]" without approving them, explaining that "there is insufficient information upon which to make a decision."

138.    On information and belief, the Amendments were not re-submitted to Interior after September 15, 2017, and the required information missing from the Amendments was not provided to Interior after that date.

139.    In approving the Amendments or allowing them to be deemed approved, Interior failed to acknowledge the rationale for its earlier decision to return the Amendments or explain why it reversed course.

140.    Interior's failure to adequately explain its approval of the Amendments, its failure to address comments raising serious legal challenges to the Amendments, and its unexplained departure from past agency practice, were arbitrary, capricious, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that Interior violated IGRA by approving the Amendments, whose sole purpose is facilitating commercial gaming on non-Indian lands;

B.      Declare that Interior violated IGRA and the APA by approving amendments that had been returned and thus were not before Interior to act upon, and by allowing the Mohegan Compact amendment (and, if applicable, the Mohegan MOU amendment) to be deemed approved when the criteria necessary for such a deemed approval were not satisfied;

C.      Declare that Interior violated the APA by failing adequately to explain the basis for approving the Amendments, for changing its earlier position without providing a reasoned explanation, for failing to respond to comments explaining why the Amendments violate IGRA, and for failing to address the novel and unprecedented nature of the Amendments;

D.      Vacate Interior's decisions approving the Mashantucket amendments and allowing the Mohegan Compact amendment (and, if applicable, the Mohegan MOU amendment) to be deemed approved;

E.      If necessary and appropriate, remand this proceeding to Interior for reconsideration in light of the relief requested above;

F.      Retain jurisdiction to ensure compliance with the Court's order;

G.      Award Plaintiffs the costs of their participation in this action, including reasonable attorneys' fees; and

H.      Grant such other relief as the Court deems just and proper.


August 7, 2019                                      Respectfully submitted,

                                                   /s/ Kevin King
                                                   Edward H. Rippey (D.C. Bar. No. 450462)
                                                   Kevin King (D.C. Bar No. 1012403)
                                                   Thomas Brugato (D.C. Bar No. 1013523)
                                                   COVINGTON & BURLING LLP
                                                   850 Tenth St. NW
                                                   Washington, DC  20001-4956
                                                   (202) 662-6000

erippey@cov.com
kking@cov.com
tbrugato@cov.com

Neil K. Roman (D.C. Bar No. 401170)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1221
nroman@cov.com

*Counsel for MGM Resorts Global Development,*
*LLC and Blue Tarp reDevelopment, LLC*